William L. GRAY, Plaintiff,

v.

MITSUI & CO. (U.S.A.), INC., a New York Corporation, Defendant.

No. 75–81–E.

United States District Court,
D. Oregon.

July 19, 1977.

Herbert W. Lombard, Jr., of Sahlstrom & Lombard, Eugene, Or., for plaintiff.

Theodore A. LeGros, of Howard, LeGros, Buchanan & Paul, Seattle, Wash., K. Patrick Neill, of Vonderheit, Hershner & Hunter, Eugene, Or., for defendant.

## OPINION

SKOPIL, Chief Judge:

In 1969 William L. Gray, a professional timber consultant, entered into an oral contract with Mitsui & Co. (U.S.A.), Inc. (Mitsui). Under the contract, Gray was to receive a commission on wood chips delivered to Mitsui by suppliers which he located. Gray found on Oregon supplier, Timber Products Co. (T/P), and Mitsui and T/P subsequently entered into a business relationship which still continues.

Gray received commissions pursuant to the oral contract for a period of five years and eight months. Mitsui then ceased making payments contending its obligation had terminated with the rescission of its original contract with T/P and the substitution of a new contract. Gray contends that Mitsui committed an anticipatory breach of their contract, which allegedly was for a period of ten years. He seeks to recover unpaid commissions for the remainder of the contract term.

Two major issues must be decided. First, is Gray's claim barred by the Statute of Frauds as an oral contract not to be performed within a year from the making?[1] Second, if his claim is not barred, what was the term of the commission contract? If Gray's interpretation of the contract is correct, the appropriate measure of damages must also be determined. Resolution of these issues depends largely upon whose version of the facts is believed.

## FACTS[2]

In 1969 Mitsui was seeking suppliers to fill a second vessel carrying wood chips from the Port of Sacramento to Japan for ultimate resale to the Honshu Paper Company. Gray, who has been in the wood products industry for 25 years, had gained experience during the 1960s in the fledgling chip export business. He was introduced to Mitsui representatives in the spring of 1969 by a mutual acquaintance, Masataka Iwakami.

The parties do not dispute that Gray and Mitsui thereafter entered into an oral commission contract under which Gray was to receive 50¢ per bone dry unit (BDU)[3] for chips delivered to Mitsui by suppliers located by Gray. Beyond that point, the parties' versions of the contract diverge. Gray and Ichiro Ito, a Mitsui employee, offered the only direct testimony as to the contract terms.

Gray testified that he agreed to locate chip suppliers providing a minimum of 50,000 BDU annually for a period of at least ten years. His responsibility was to find the necessary suppliers, assist in negotiating contracts with them, and ensure that a reliable flow of high quality chips was established for the ten years. In return for his services, he was to receive a monthly commission of 50¢ per BDU for chips delivered to Mitsui by these suppliers.[4] Gray's testimony was consistent throughout.

Ito's description of the commission contract was much less definite. In one written witness statement, for example, he testified that the contract with Gray was not finalized until *after* the agreement with T/P had been consummated.[5] Elsewhere, he testified that the commission contract was entered into *before* Gray began to look for a supply source.[6] In Mitsui's view, however, the important point made by Ito was that Gray's commission was to be paid *only so long as the original supply contract remained in effect.* Ito could not recall that a ten-year period was ever mentioned.[7]

Negotiations with T/P commenced in the summer of 1969 and culminated in the signing of a written contract on September 8, 1969 (Pl.Ex. 2). Under the contract, T/P agreed to supply a minimum of 40,000 BDU and a maximum of 60,000 BDU annually

---

1. The relevant Oregon statute, ORS 41.580(1), provides:

   "In the following cases the agreement is void unless it, or some note or memorandum thereof, expressing the consideration, is in writing and subscribed by the party to be charged, or by his lawfully authorized agent; evidence, therefore, of the agreement shall not be received other than the writing, or secondary evidence of its contents in the cases prescribed by law:

   "(1) An agreement that by its terms is not to be performed within a year from the making."

2. Most of the testimony in the case was in the form of written witness statements, depositions, and answers to written interrogatories. The names of the witnesses who testified and the sources of their testimony are listed in the Appendix.

3. A bone dry unit of wood chips is that quantity which contains 2,400 pounds of moisture-free wood. Pl.Ex. 2, p. 3.

4. Deposition of William L. Gray, p. 9, lines 7–15; p. 10, lines 10–14; p. 20, lines 4–6 and 12–15; p. 21, lines 6–14; Plaintiff's Witness Statement of William L. Gray, p. 4, line 21—p. 5, line 20.

5. Defendant's Witness Statement of Ichiro Ito, p. 3, lines 4–12.

6. Plaintiff's Adverse Witness Statement of Ichiro Ito, p. 2, lines 6–22. See also Agreed Fact No. (1) in the Pretrial Order and defendant's answer to plaintiff's interrogatory No. 2(2) (Pl.Ex. 76(b)).

7. Deposition of Ichiro Ito, p. 11, line 24—p. 13, line 24; Defendant's Witness Statement of Ichiro Ito, p. 3, lines 12–18, and p. 5, lines 18–20.

for a period of ten years commencing January 1, 1970. Mitsui was to pay $22.40 per BDU (subject to freight and wage adjustments and an annual 50¢ increase). Paragraph 2 of the contract permitted either party to cancel upon written notice after five years and eight months.

Under a companion contract (Pl.Ex. 3) with W. H. Gonyea & Associates (Gonyea), an affiliate of T/P, Mitsui agreed to pay an additional $4.10 per BDU for Gonyea's services in administering the performance of the contract.[8] The $4.10 included Gray's 50¢ commission, which was funnelled through Gonyea as an accommodation to Mitsui. T/P and Gonyea did not know the nature or terms of Mitsui's agreement with Gray but merely paid him in accordance with Mitsui's directions.

Within a few months, Mitsui and T/P began discussing possible increases in contract volume and in price per BDU. These discussions, prompted by the growing demands of Mitsui's customers and by rising chip prices, were to continue intermittently through 1974.

Early in 1970 the parties discussed a proposal to increase chip volume to 90,000 BDU annually, to be followed later by the addition of another 60,000 BDU.[9] The parties were unable to implement the proposal fully at that time.[10] On August 25, 1970, however, Mitsui and T/P did agree to a written modification of the 1969 chip agreement (Pl.Ex. 30) increasing the chip volume as of January 1, 1971, to a minimum of 90,000 BDU and a maximum of 100,000 BDU annually. A provision was added to the cancellation clause requiring the parties to enter into "serious price renegotiations" before exercising the right to cancel upon written notice. In conjunction with the modification of the chip agreement, Mitsui and Gonyea also executed a written modification of the 1969 service agreement (Pl.Ex. 35).

At the same time, Mitsui and Gray agreed that Gray would be paid a 50¢ commission for the first 50,000 BDU delivered annually under the modified chip agreement but would receive only 25¢ per BDU for deliveries over 50,000 BDU. Mitsui acknowledged the 25¢ commission in writing to both Gray (Pl.Ex. 31) and Gonyea (Pl.Ex. 32 and 36).

During late 1970 and early 1971, Mitsui and T/P continued their efforts to reach an agreement for 150,000 BDU annually to supply a third chip vessel.[11] Their plans finally fell through because the proposed price was too high. Mitsui was instructed by Honshu to seek less costly supply sources through ports other than Sacramento.[12] As it turned out, Japanese chip requirements decreased during 1971 and additional sources were not required at that time.

The relationship between Mitsui and T/P continued under the modified chip agreement without any significant problems for the next three years. Gray's involvement with administration of the contract had apparently ended by the middle of 1971.[13] He moved to Seattle in November, 1972, to assume a position as vice president of Kodiak Lumber Mills, a joint venture between Mitsui and Nihaam Industries. He served in that capacity until March, 1974 (including a year in Alaska), when he returned to Oregon.

By the middle of 1974, T/P had concluded that the price structure under the Mitsui contract was no longer reasonable in view of the rising market. T/P therefore in-

---

**8.** According to Thomas E. Brownhill, counsel and chief negotiator for T/P, the service agreement was entered into at Mitsui's request. Gonyea's service fee in fact represented a portion of the true purchase price for the chips.

**9.** Jt.Ex. 2; Pl.Ex. 15, 18, 20, 23.

**10.** Pl.Ex. 24.

**11.** Pl.Ex. 34, 38–42, 44.

**12.** Pl.Ex. 43 and 45.

**13.** The last reference to Gray in correspondence between Mitsui and T/P appears in a letter of July 9, 1971, from T/P to Mitsui (Pl.Ex. 48) regarding a strike at the Port of Sacramento.

formed Mitsui that it would exercise its right to terminate the existing contract as of August 31, 1975 (the end of the five-year, eight-month period under the cancellation clause) unless a new agreement could be reached.

Following the ensuing negotiations, Mitsui and T/P rescinded their prior chip agreement and substituted a new written contract (Pl.Ex. 57) effective October 1, 1974. The form of the new contract was basically the same as the old one. Its term was from October 1, 1974, to December 31, 1979, the unexpired portion of the original ten-year period. The volume of chips was increased, however, as follows:

| Dates | Volume |
|---|---|
| 10/1/74 – 3/31/75 | 32,000 BDU annually (16,000 BDU for the six-month period) |
| 4/1/75 – 12/31/75 | 100,000 BDU annually (75,000 BDU for the nine-month period) |
| 1/1/76 – 12/31/79 | 150,000 – 170,000 BDU annually |

The contract allowed Mitsui to divert chips from Sacramento upon reasonable notice. In exchange for a price increase to $54.00 per BDU (plus annual price adjustments, determined by arbitration if necessary), T/P agreed to a contract without a cancellation clause. Paragraph 19 of the new

14. The entity receiving the service fee was changed from Gonyea to The Hill Sales Co. (Hill) at Gonyea's request.

15. Deposition of Bob A. Yasunobu, p. 48, line 15 – p. 51, line 5; p. 66, line 15 – p. 67, line 15; deposition of Thomas E. Brownhill, p. 51, line 2—p. 52, line 1; p. 60, line 24—p. 61, line 12; trial testimony of Thomas E. Brownhill, Tr. p. 11, line 25—p. 12, line 2.

16. Monthly payments received by Gray are set out in plaintiff's supplemental answers to defendant's interrogatories, Exhibit A (Pl.Ex. 76(a)).

17. The volumes contracted for and the volumes actually delivered were as follows:

contract expressly rescinded the 1969 agreement, as modified in 1970. The old service agreement was also rescinded effective October 1, 1974, and a new agreement substituted providing for a service fee of $6.00 per BDU (Def.Ex. 102 and 103).[14]

Representatives of both Mitsui and T/P testified that the matter of Gray's commission never came up during the 1974 negotiations.[15] Gray's commission payments ceased, however, after he was paid for September, 1974, deliveries. After two months, Gray contacted Mitsui for an explanation. It was only then that he learned of the new contract between Mitsui and T/P. After consulting with legal counsel, Mitsui eventually paid Gray retroactively for the last three months of 1974 and then continued monthly payments as usual through the end of August, 1975. Mitsui took the position in a letter of December 20, 1974, to Gray's attorney (Jt.Ex. 1) that its obligation to Gray would terminate after the five-year, eight-month minimum term of the original contract with T/P.

Gray received commissions totaling $157,-106 for chip deliveries from January, 1970, through August, 1975.[16] The commissions paid to him were based on actual deliveries, which were consistently less than the minimum volumes specified in the chip agreement.[17]

| | Contract Volume | * Actual Deliveries |
|---|---|---|
| 1970 | 40,000 – 60,000 BDU | 34,709 BDU |
| 1971 | 90,000 – 100,000 BDU | 59,962 BDU |
| 1972 | 90,000 – 100,000 BDU | 81,797 BDU |
| 1973 | 90,000 – 100,000 BDU | 72,741 BDU |
| 1/1/74 – 9/30/74 | 67,500 – 75,000 BDU ** | 34,051 BDU |
| 10/1/74 – 3/31/75 | 16,000 BDU ** | 20,454 BDU |
| 4/1/75 – 8/31/75 | 41,667 BDU ** | 38,223 BDU |

The same pattern of under-deliveries has continued since September of 1975:

| | Contract Volume | * Actual Deliveries |
|---|---|---|
| 9/1/75 – 12/31/75 | 33,333 BDU ** | 29,600 BDU |
| 1976 | 150,000 – 170,000 BDU | 82,803 BDU |
| 1/1/77 – 3/31/77 | 37,500 – 42,500 BDU ** | 19,529 BDU |

* Extracted from Gonyea and Hill invoices (Pl. Ex. 78(a) and (b); Def. Ex. 1 introduced at the hearing of March 30, 1977; affidavit of Bob Yasunobu attached to defendant's memorandum filed April 25, 1977). Some of the invoices are illegible, in which case the figures have been reconstructed as accurately as possible.

** Prorated from annual volumes specified in the applicable chip agreement.

STATUTE OF FRAUDS [18]

Mitsui has, of course, admitted the existence of an oral commission contract with Gray having duration of five years and eight months. If Mitsui's version of the contract is correct, Mitsui has satisfied in full its contractual obligation to Gray. If, on the other hand, Gray's version of the contract term is correct, Mitsui contends that recovery by him of unpaid commissions is barred by the Statute of Frauds because the commission contract was not to be performed within a year from the making.

Gray advances a number of arguments why Mitsui is not entitled to raise the defense of the Statute of Frauds at all.[19] Assuming Mitsui is not barred at the outset from relying on the Statute of Frauds, Gray contends that the Statute has been waived or does not apply for various reasons.[20]

I shall not discuss each of these arguments in detail. In my view, even assuming that Mitsui has properly raised the Statute of Frauds, it is estopped from asserting that defense against Gray under the facts of this case.

■ Under Oregon law,[21] equitable estoppel may preclude a party from asserting the Statute of Frauds in an action at law for damages. This doctrine rests upon the principle that, where one has acted to his detriment solely in reliance on an oral agreement, an estoppel may be raised to defeat the defense of the Statute of Frauds. *Engelcke v. Stoehsler*, 273 Or. 937, 944, 544 P.2d 582, 585–586 (1975). See generally Annot., 56 A.L.R.3d 1037 (1974); 2 Corbin,

Contracts §§ 422A and 459 (supp. 1971); 3 Williston, Contracts § 533A (3d ed. 1960); Restatement (Second) of Contracts § 217A (Rev.Tent. Drafts Nos. 1–7, 1973).

The leading Oregon case is *Stevens v. Good Samaritan Hospital and Medical Center*, 264 Or. 200, 504 P.2d 749 (1972), The plaintiff, an engineer, was employed by the defendant under an oral contract. He was discharged after only five years of the fifteen-year contract had elapsed. The Oregon Supreme Court held that the trial judge erred in sustaining the Defendant's demurrer based on the Statute of Frauds: plaintiff's allegation that he had abandoned a lucrative business in reliance on the contract was sufficient to take the contract out of the Statute. The court stated that the plaintiff's allegation gave rise to a form of estoppel:

"Williston states that estoppel may defeat the defense of the statute of frauds:

'Where one has acted to his detriment solely in reliance on an oral agreement, an estoppel may be raised to defeat the defense of the Statute of Frauds. This is based upon the principle established in equity, and applying in every transaction where the Statute is invoked, that the Statute of Frauds, having been enacted for the purpose of preventing fraud, shall not be made the instrument of shielding, protecting, or aiding the party who relies upon it in the perpetration of a fraud or in the consummation of a fraudulent scheme. * * *.' 3 Williston, Contracts (3d ed.), § 533A, p. 796.

**18.** At the time of trial I reserved a ruling on the Statute of Frauds issue. Evidence was then introduced subject to that ruling.

**19.** Specifically, Gray argues that the Statute of Frauds has been waived because it was not affirmatively pleaded in Mitsui's answer as required by Fed.R.Civ.P. 8(c), that inclusion of the Statute of Frauds as an issue in the pretrial order had no effect because it was done under protest, that Mitsui has not properly requested leave to amend, and that, if it has, leave to amend should be denied.

**20.** Gray's individual contentions are as follows: (1) that either Mitsui's admission of the contract in the pleadings or various written docu-

ments introduced in evidence constitute a written memorandum sufficient to remove the contract from the Statute, (2) that Mitsui's admission of the contract through its conduct and the testimony of its employees waives the Statute, (3) that Mitsui is estopped to raise the Statute because of its position that Gray has fully performed (which would remove the bar of the Statute), (4) that Mitsui is precluded by equitable estoppel from asserting the Statute, and (5) that application of the Statute would be unjust.

**21.** The parties agree that Oregon law applies to the commission contract.

"This court has recognized this principle and Williston cites some of our decisions in support of the statement above quoted." *Id.* at 204, 504 P.2d at 750–751.

The opinion in *Stevens* cited two prior Oregon cases in which the principle of estoppel had been applied in actions at law. In the first, *Neppach v. Oregon & Cal. R.R.*, 46 Or. 374, 80 P. 482 (1905), the purchaser under a land sales contract had failed to make payments when due in reliance on the seller's oral promise to extend the time for payment until a dispute over ownership of the land had been settled. In the second, *United Farm Agency v. McFarland*, 243 Or. 124, 411 P.2d 1017 (1966), the owner of a ranch had agreed to accept less favorable terms on the sale of his property in reliance on the broker's oral promise to accept payment of his commission in installments. In both cases, the action of the first party in reliance on the promise of the second gave rise to an estoppel against asserting the Statute of Frauds.

■ I find that the principle of estoppel is equally applicable to this case. In reasonable reliance on Mitsui's promise, Gray took action to his substantial detriment. At considerable personal expense, he devoted two years of his time and efforts to securing a reliable, high-quality chip supply for Mitsui.[22] He abstained from offering his services to any other chip exporter for a period of six years (until Mitsui repudiated the commission contract), foregoing possibly lucrative opportunities in an expanding market. In reliance on the ten-year term of the contract, he agreed to accept a reduced commission of only 25¢ per BDU on T/P deliveries over 50,000 BDU annually.[23] Under these circumstances, injustice can be avoided only by enforcing Mitsui's promise. Mitsui is estopped to assert the Statute of Frauds as a defense to Gray's claim.

22. I find incredible Mitsui's contention that Gray's sole function was to introduce T/P to Mitsui. The documentary evidence and the testimony of T/P employees establish convincingly the central role played by Gray in negotiating the supply contract and ensuring that the supply was reliable. Even more absurd is Mit-

## TERM OF THE COMMISSION CONTRACT

■ As noted in the summary of facts above, Gray's position is that Mitsui agreed to pay him a monthly commission for a period of ten years on chips delivered by suppliers he had located. In his view, the rescission of Mitsui's original contract with T/P and the substitution of a new contract did not affect Mitsui's obligation to him. I am persuaded by the evidence that Gray is correct.

Gray's testimony about the oral agreement with Mitsui was consistent, unlike Ito's. I found Gray to be a credible witness. The record supports his testimony that Mitsui was seeking chip sources to satisfy Honshu's needs for a period of ten years. The original 1969 contract with T/P, like the substituted 1974 contract, extended through the end of 1979, a period of ten years. During the 1960s, long-term commission arrangements for substantial sums were not uncommon in the new chip export business. Gray himself had been involved in a similar arrangement with another exporter during 1967 to 1969 under which he was entitled to receive $300,000 in commission payments over a period exceeding ten years. Gray's business contacts and his expertise allowed Mitsui and T/P to enter into a mutually profitable relationship leading to sales in the millions of dollars. The commission arrangement testified to by Gray does not seem at all unreasonable.

Mitsui places undue emphasis upon the cancellation clause of the 1969 contract and 1970 modification. If, as I have concluded, the commission contract was entered into *before* the contract with T/P was negotiated, the clause does not necessarily have any direct relationship to the commission contract at all. Should T/P exercise its right to terminate after five years and eight months, Gray's right to a commission on T/P's deliveries would also terminate; but

sui's suggestion that Gray was acting for *T/P* when he engaged in some of these activities.

23. Plaintiff's Witness Statement of William L. Gray, p. 20, line 13—p. 21, line 8; trial testimony of William L. Gray, tr. p. 57, lines 2–18.

he would retain the right to receive commissions on deliveries by any other suppliers he might locate either before or after that time.[24] The letter of October 31, 1969 (Def.Ex. 101) from Mitsui to Gray regarding the meaning of the cancellation clause was related not to Gray's commission but to a possible ambiguity in that clause.

Mitsui's reliance on the cancellation clause is misplaced for yet another reason. T/P representatives testified that the clause was really intended not as a *cancellation* clause but as a *renegotiation* clause so that T/P would not be locked into an untenable price in a volatile market.[25] The history of the constant negotiations between Mitsui and T/P bears out this testimony. The 1970 modification added to the cancellation clause the requirement that notice to cancel be given only after "serious price renegotiations". Even more significant, contract volume and price were renegotiated in 1974 without even adhering to the terms of the cancellation clause.

Despite Mitsui's contention to the contrary, I see no significance for purposes of this case in the 1974 rescission of Mitsui's original contract with T/P and the substitution of a new contract. The new contract was merely a natural outgrowth of the continuing discussion by Mitsui and T/P of possible volume and price changes as a result of the changing market. The renegotiations were at the insistence of T/P and had nothing to do with Gray's commission, which was never mentioned. Except for changes in volume and price and elimination of the cancellation clause, the new contract was not significantly different from the old one. Mitsui referred to the new contract as "an extension of [the prior] agreement" (Pl.Ex. 55, p. 1). Mitsui's argu-

ment that it deliberately elected to rescind the 1969 contract and enter into a new one is not persuasive. I accept instead the testimony of T/P's counsel that he personally chose the form of rescission rather than another modification because he felt it was "easier" and "cleaner".[26] Gray, at least, obviously did not attach any significance to rescission of the original contract: at one point during prior negotiations he *himself* proposed to Mitsui that changes being considered be implemented by means of rescinding the original contract with T/P.[27]

I have no reason to believe that Mitsui's reliance upon the five-year, eight-month cancellation clause is asserted in anything other than good faith. Nevertheless, the evidence leads me to conclude that Mitsui did not attach importance to this clause until after it had sought legal advice to determine what should be done about Gray. Finding nothing in writing to confirm the terms of the commission contract, Mitsui took the not unreasonable position that payment of the commissions must have been contingent on continuation of the original chip contract with T/P.[28] Consistent with this position, Mitsui retroactively acknowledged its obligation to continue commission payments for the minimum term of that contract, even though the contract itself had already been rescinded.

■ Having found that Mitsui was in fact obligated to pay Gray's commission for the remainder of the ten-year period, I must also conclude that Mitsui committed an anticipatory breach of their contract. Mitsui's repudiation of the contract was clear and unequivocal.[29] Gray is therefore entitled to damages for Mitsui's breach.[30]

**24.** Gray did contact other suppliers on Mitsui's behalf even after the contract with T/P had been consummated.

**25.** Deposition of Thomas E. Brownhill, p. 19, line 8—p. 10, line 14; Plaintiff's Witness Statement of William C. Smith, p. 2, line 24—p. 3, line 18. Gray testified similarly. Plaintiff's Witness Statement of William L. Gray, p. 7, line 22—p. 8, line 12.

**26.** Deposition of Thomas E. Brownhill, p. 52, lines 2–12; p. 58, line 8—p. 59, line 2; Plaintiff's Witness Statement of Thomas E. Brown-

hill, p. 4, lines 6–17; trial testimony of Thomas E. Brownhill, Tr. p. 11, lines 3–24.

**27.** Plaintiff's Witness Statement of William L. Gray, p. 17, lines 6–26.

**28.** See Pl.Ex. 70 and 71 (translated into English in Jt.Ex. 3) and Deposition of Bob A. Yasunobu, pp. 49–67.

**29.** See Jt.Ex. 1 and Exhibit A to Deposition of Wayne R. Atwood.

**30.** The traditional view has apparently been that one who has himself rendered full per-

## DAMAGES

The record reflects the actual quantities of wood chips delivered from T/P to Mitsui from January, 1970, through March, 1977, as well as the volume of chips contracted for during the ten-year period of Gray's commission contract. This evidence is sufficient to permit the calculation of Gray's damages with reasonable certainty. The damages must be based upon *actual* deliveries (past or projected), however, rather than on volumes specified in the chip agreement. Gray and Mitsui have established by their prior course of dealing that the commissions are dependent on actual deliveries, which have been consistently less than contract volumes.

Past-due commissions for September, 1975, through March, 1977, are easily computed from deliveries reflected on invoices introduced in evidence [31]:

| Date of Delivery | Amount Delivered | Commission Rate | Amount of Commission |
|---|---|---|---|
| 9/75 | 7,535.20 BDU | 25¢/BDU | $1,883.80 |
| 10/75 | 9,583.73 BDU | 25¢/BDU | $2,395.93 |
| 11/75 | 5,964.73 BDU | 25¢/BDU | $1,491.18 |
| 12/75 | 6,516.05 BDU | 25¢/BDU | $1,629.01 |
| 1/76 | 9,904.27 BDU | 50¢/BDU | $4,952.14 |
| 2/76 | 9,371.06 BDU | 50¢/BDU | $4,685.53 |
| 3/76 | 8,384.60 BDU | 50¢/BDU | $4,192.30 |
| 4/76 | 7,897.16 BDU | 50¢/BDU. | $3,948.58 |
| 5/76 | 6,741.08 BDU | 50¢/BDU | $3,370.54 |
| 6/76 | 4,880.50 BDU | 50¢/BDU | $2,440.25 |
| 7/76 | 2,821.33 BDU | 50¢/BDU | $1,706.61 |
| | 1,183.74 BDU | 25¢/BDU | |
| 8/76 | 5,497.08 BDU | 25¢/BDU | $1,374.27 |
| 9/76 | 6,972.54 BDU | 25¢/BDU | $1,743.14 |
| 10/76 | 6,951.17 BDU | 25¢/BDU | $1,737.79 |
| 11/76 | 6,982.85 BDU | 25¢/BDU | $1,745.71 |
| 12/76 | 5,215.86 BDU | 25¢/BDU | $1,303.84 |
| 1/77 | 6,959.89 BDU | 50¢/BDU | $3,479.95 |
| 2/77 | 6,202.96 BDU | 50¢/BDU | $3,101.48 |
| 3/77 | 6,865.73 BDU | 50¢/BDU | $3,182.87 |

Commissions which would have been paid during the remainder of the ten-year period can only be estimated. The 1974 chip agreement specified chip deliveries between 150,000 and 170,000 BDU annually beginning in 1976. Actual deliveries in 1976 amounted to 82,803 BDU, or an average of 6,900 BDU monthly. Actual deliveries averaged 6,510 BDU per month for the first three months of 1977. I find that Gray's damages for April, 1977, through December 31, 1979, should be based upon estimated deliveries of 6,900 BDU per month. These damages are computed as follows:

| Date of Delivery | Estimated Delivery | Commission Rate | Amount of Commission |
|---|---|---|---|
| 4/77 | 6,900 BDU | 50¢/BDU | $3,450.00 |
| 5/77 | 6,900 BDU | 50¢/BDU | $3,450.00 |
| 6/77 | 6,900 BDU | 50¢/BDU | $3,450.00 |
| 7/77 | 6,900 BDU | 50¢/BDU | $3,450.00 |
| 8/77 | 2,871.42 BDU | 50¢/BDU | $2,442.86 |
| | 4,028.58 BDU | 25¢/BDU | |
| 9/77 | 6,900 BDU | 25¢/BDU | $1,725.00 |
| 10/77 | 6,900 BDU | 25¢/BDU | $1,725.00 |
| 11/77 | 6,900 BDU | 25¢/BDU | $1,725.00 |
| 12/77 | 6,900 BDU | 25¢/BDU | $1,725.00 |
| 1/78 | 6,900 BDU | 50¢/BDU | $3,450.00 |
| 2/78 | 6,900 BDU | 50¢/BDU | $3,450.00 |
| 3/78 | 6,900 BDU | 50¢/BDU | $3,450.00 |
| 4/78 | 6,900 BDU | 50¢/BDU | $3,450.00 |
| 5/78 | 6,900 BDU | 50¢/BDU | $3,450.00 |
| 6/78 | 6,900 BDU | 50¢/BDU | $3,450.00 |
| 7/78 | 6,900 BDU | 50¢/BDU | $3,450.00 |
| 8/78 | 1,700 BDU | 50¢/BDU | $2,150.00 |
| | 5,200 BDU | 25¢/BDU | |
| 9/78 | 6,900 BDU | 25¢/BDU | $1,725.00 |
| 10/78 | 6,900 BDU | 25¢/BDU | $1,725.00 |
| 11/78 | 6,900 BDU | 25¢/BDU | $1,725.00 |
| 12/78 | 6,900 BDU | 25¢/BDU | $1,725.00 |

1/79 – 12/79 Same as 1978 computations.

Only mechanical steps remain to be taken in calculating the amount of Gray's damages award. Gray is entitled under Oregon law to prejudgment interest

---

formance cannot recover damages for anticipatory breach, at least where the other party's sole obligation is to make future payments of money. See, *e. g.*, Annot., 105 A.L.R. 460 (1936); 11 Williston, Contracts § 1326 (3d ed. 1968); Restatement of Contracts § 318, Comment e (1932). Professor Corbin argues persuasively, however, that the doctrine of anticipatory breach is not so limited. 4 Corbin, Contracts §§ 962–965 (1951). No Oregon cases in point have been found.

The view adopted makes no difference to the outcome of this particular case. Gray testified that he agreed to secure a ten-year supply of chips and that he stood ready, willing, and able to take any steps necessary to ensure that the flow of chips continued either from T/P or from other sources. I find that Gray had not rendered full performance at the time Mitsui anticipatorily breached the commission contract.

31. Pl.Ex. 78(b); Def.Ex. 1 introduced at the hearing of March 30, 1977; affidavit of Bob Yasunobu attached to defendant's memorandum filed April 25, 1977. Some deliveries were made to locations other than the Port of Sacramento. Although the commission contract initially contemplated that all deliveries would be to Sacramento, I find that the contract was subsequently modified to extend to deliveries to other locations as well. Mitsui in fact paid Gray commissions on deliveries to other locations prior to September, 1975.

on past commissions. See *Soderhamn Machine Manufacturing Company v. Martin Bros. Container & Timber Products Corp.,* 415 F.2d 1058, 1064 (9th Cir. 1969). I find that six percent is a reasonable rate of interest. By like token, damages based on commissions due in the future should be discounted to present value. 4 Corbin, Contracts § 964, at 870–871 (1951). I find that six percent is likewise an appropriate discount rate. The parties are directed to apply the applicable interest or discount rate to each monthly commission reflected above, as of the twentieth of the following month,[32] and to inform the court within fifteen days of the total damages owing as of August 1, 1977.[33] Judgment will then be entered accordingly.

This opinion shall constitute findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## APPENDIX

### TESTIMONY CONSIDERED BY THE COURT

| Name of Witness | Source of Testimony | Docket Number |
| --- | --- | --- |
| William L. Gray | Plaintiff's Witness Statement | 48 |
| | Deposition | 19 |
| | Trial Transcript (pp. 23–70) | 66 |
| Thomas E. Brownhill | Plaintiff's Witness Statement | 49 |
| | Deposition | 36 |
| | Trial Transcript (pp. 8–17) | 66 |
| Wayne R. Atwood | Plaintiff's Witness Statement | 52 |
| | Deposition | 35 |
| William C. Smith | Plaintiff's Witness Statement | 51 |
| Ichiro Ito | Plaintiff's Adverse Witness Statement | 50 |
| | Defendant's Witness Statement | 54 |
| | Deposition | 40 |
| | Trial Transcript (pp. 19–22) | 66 |
| Bob A. Yasunobu | Defendant's Witness Statement | 53 |
| | Deposition | 41 |
| Masataka Iwakami | Deposition upon Written Interrogatories | 47 |
| Seiichi Aso | Answers to Plaintiff's Interrogatories | 59 |
| Virginia Ruth Bear | Trial Transcript (pp. 72–77) | 66 |

**32.** The chip agreement specified that Mitsui was to pay by the twentieth day of each calendar month for all chips delivered by T/P during the preceding calendar month. Pl.Ex. 57, p. 5.

**33.** The commission for each month, with interest or discount as appropriate to August 1, 1977, should be computed separately and the resulting figures then totaled. For example, the damages for April, 1977, will be the sum of $3,450.00 plus interest at 6% from May 20, 1977. The damages for December, 1979, will be the sum of $1,725.00 discounted at 6% from January 20, 1980.