Argued and submitted August 24, affirmed December 30, 1981

# ACE ELECTRIC COMPANY,
*Respondent,*

*v.*

# PORTLAND GENERAL ELECTRIC COMPANY et al,
*Appellants.*

## (No. 6090, CA 18782)

637 P2d 1366

James K. Buell, Portland, argued the cause for appellants. With him on the briefs were Susan E. Ertle, and Buell, Black, Gates & Dupuy, Portland.

James H. Clarke, Portland, argued the cause for respondent. With him on the brief was Spears, Lubersky, Campbell & Bledsoe, Portland.

Before Buttler, Presiding Judge, Joseph, Chief Judge and Warren, Judge.

WARREN, J.

## WARREN, J.

Ace Electric Company (Ace) brought this action against Portland General Electric Company, The Boardman Power Company, and Marine Midland Bank[1] (PGE), to recover the value of work which it performed on PGE's Boardman Coal Project. Ace alleged that the work in question was outside the scope of its construction contract and it is, therefore, entitled to extra compensation. Alternatively, it contended that, if the work was within the scope of the contract, it is entitled to the reasonable value of the work because of its unilateral mistake of fact. PGE appeals from a judgment for Ace.

PGE is an Oregon public utility, and Ace is an electrical construction contractor. Swan Wooster is a major engineering firm, which PGE employed to act as architect/engineer in supervising the construction of the Boardman Coal Project, a $350,000,000 construction project located in Morrow County.

On January 4, 1977, PGE invited bids on preliminary electrical work from nine electrical contractors recommended by Swan Wooster as qualified and experienced. Each contractor received identical bid documents, which included the general terms and conditions of bidding and specifications and drawings which were intended to identify the nature and extent of the work to be bid. The bid required, among other things, a number of underground duct banks, which were to be constructed of either ordinary concrete with plastic conduit or reinforced concrete with galvanized rigid steel conduit (reinforced duct banks). The specifications stated that the reinforced duct banks were to be used wherever duct banks extended under railroads or roadways or in fill areas. Unfortunately, the electrical drawings, which described the work in detail and which showed the location of some of the duct banks, did not show either the railroads, roadways, or fill areas, or duct banks which were to extend under them. As a result, a contractor bidding on the documents submitted could not accurately bid the project as contemplated by PGE. Moreover, nothing in the original bid package indicated that the drawings were incomplete.

---

[1] The other named defendants did not appear.

On February 8, PGE sent to all bidders an "addendum 4." This addendum, "issued * * * for information and reference only," consisted of construction drawings of the type used by road and railroad contractors, rather than by electrical contractors, and did not show any duct banks. The drawings did show the location of the roads and railroads; thus, an alert bidder, if he integrated these drawings with the other materials, could estimate with reasonable accuracy the amount of reinforced duct banks needed for the project. Neither the addendum itself nor PGE informed the bidders that they should so use the drawings, however. Only three of the nine bidders took account of these duct banks in formulating their bids.

Ace was one which did not, and it submitted the low bid of $183,300. This bid was substantially less than the high bid of $259,583 and the $450,000 that Swan Wooster had independently estimated would be the cost of this job. Swan Wooster suspected immediately upon opening the bids that most of the bidders, and particularly Ace, had failed to provide for reinforced duct banks under roads, railroads, and in fill areas.[2] Swan Wooster's engineer, in a report to PGE dated March 14, recommended awarding the contract to Ace, but recommended that PGE first discuss with Ace the amount and type of conduit it expected to use in order to determine whether Ace's bid included all the necessary work. PGE decided not to follow this recommendation, however, and instead phoned Ace's estimating manager to inquire only whether Ace was satisfied with its bid. PGE mentioned none of the matters which had concerned Swan Wooster and, when asked by Ace why it was inquiring, responded only that it was "checking" because Ace's bid was "so low."

Although Ace rechecked its bid because of this telephone conversation, it did not discover its mistake, and the contract was executed on March 31. On April 4 and April 11, Ace was provided with new drawings which showed the reinforced duct banks in detail and their precise location

---

[2] Swan Wooster had estimated that the job would require 10,670 feet of reinforced duct banks. Ace's bid included less than 1,100 feet. In fact, only one bidder included more than 10,000 feet, and no others included more than 2,400 feet.

under the roads and railroad. Ace immediately objected to Swan Wooster that the drawings required work which was outside the contract. Swan Wooster ordered Ace to proceed with the work and to submit a proposal for additional compensation in accordance with contract provisions, which required Ace to submit all questions of contract interpretation to Swan Wooster, whose decision was final unless a written protest was submitted to PGE and which further required that, pending a decision, Ace had to proceed with the work, if Swan Wooster so ordered. Ace followed the various protest procedures and kept separate records for the disputed work.

Ace's claim, totalling $53,260.77,[3] was ultimately rejected by PGE, and Ace sought recovery in circuit court under three legal theories. The first two theories involved interpreting the contract in such a manner that the disputed work was not a part of it. Under the third theory, Ace sought recovery for the reasonable value of supplying reinforced duct banks as relief from its unilateral mistake. The trial court found for Ace on all of its theories and also awarded Ace $30,000 attorney fees and prejudgment interest.

We will assume, as contended by PGE, that the disputed work was part of the contract, but we agree with the trial court that Ace is entitled to recover on its unilateral mistake theory.

The controlling principle is stated as follows:

> "[I]n this State an offer and an acceptance are deemed to effect a meeting of the minds, even though the offeror made a material mistake in compiling his offer, provided the acceptor was not aware of the mistake and had no reason to suspect it. But if the offeree knew of the mistake, and if it was basic, or if the circumstances were such that he, as a reasonable man, should have inferred that a basic mistake was made, a meeting of the minds does not occur. * * *" *Rushlight Co. v. City of Portland,* 189 Or 194, 244, 219 P2d 732 (1950).

*See also, Highway Com. v. State Construction Co.,* 203 Or 414, 436-437, 280 P2d 370 (1955), where the *Rushlight* principle

---

[3] PGE admitted that, if Ace is entitled to recover, the amount that it has claimed is reasonable.

was held to apply generally to bidders' errors which are made without gross negligence. It is clear that this case falls squarely under the *Rushlight* principle. The trial court determined that Swan Wooster knew that Ace had made a mistake, and our review of the record confirms that conclusion. Moreover, Swan Wooster, in addition to being PGE's agent, communicated its misgivings directly to PGE.

PGE makes a great deal of its request that Ace recheck its bid, styling this telephone call a "red flag," which was designed to alert Ace to its error but which could not be more explicit, because "negotiation" is improper in lump sum bidding. In the first place, we find PGE's explanation for the obscurity of the warning strikingly unpersuasive, as "negotiation" was hardly necessary — all that *Rushlight* or common fairness would have required is a question as to whether the railroads, roadways and fill areas shown on addendum 4 had been considered in making the bid.[4] More important, a warning alters the result under *Rushlight* only if it eradicated PGE's suspicion that Ace's bid was in error. That is, warning or no, the question is still whether, at the time the contract was signed, PGE had reason to know that Ace was mistaken as to the scope of the contract. It is clear that PGE strongly suspected a mistake when the bids were opened, and Ace's response to the "red flag" could hardly have eliminated that suspicion.[5]

PGE argues, nevertheless, that under *Rushlight* a mistaken offeror's only remedy is rescission of the contract and that because Ace "elected" to proceed with the work

----

[4] The "negotiation" problem would, of course, have been solved if PGE had alerted all the bidders at this time. To do so would have been in PGE's interest because if Ace had discovered its error and withdrawn or revised its bid, PGE would have had to go through the same process with the next lowest bidder. The Supreme Court has not been reluctant to infer the acceptor's motive in these situations, *Rushlight Co. v. City of Portland, supra,* 189 Or at 245, and we are satisfied that PGE's warning was deliberately obscure.

[5] Any notion that PGE's "red flag" satisfied its "duty to warn" misconceives the basis of the *Rushlight* rule; namely, whether the acceptor was aware of the bidder's mistake and, if so, the desire to relieve the bidder of the burden of that mistake. That Ace may have made *two* mistakes — misinterpretation of the contract and misinterpretation of the "red flag" — does not alter the fact that PGE knew, or had reason to know, of the mistake at the time the contract was signed. Thus, any attempt to conceal the mistake from the bidder and still satisfy the "duty to warn" is, by its nature, doomed to failure — exactly as it should be.

after it became aware of its mistake, it may not recover. In cases of this type, the search is for an equitable solution, however, and we see no reason in policy or precedent[6] to so limit Ace's remedy. Rescission was the only remedy awarded in *Rushlight* and *State Construction,* but it was the only remedy sought. In neither of those cases did the acceptor order the bidder to proceed under a contract which required the bidder to do so and which provided that the dispute would be resolved through prescribed protest procedures. Here, all parties understood that Ace must be paid if its claim should be sustained and, by agreement, a separate record was kept of the cost of the reinforced duct banks. Under these circumstances, it may be fair to say that PGE impliedly promised to pay the reasonable value of the reinforced duct banks if Ace's claim should be upheld. More important, the principles of common fairness which, after all, underlie the *Rushlight* doctrine certainly support this remedy.[7] *See Palmberg v. Astoria,* 101 Or 224, 232, 199 P 630 (1921).

■　　　Finally, PGE contends that the award of prejudgment interest was error, because it disputed its liability in good faith. PGE is incorrect. *Gellert v. Bank of California, Nat. Assn.,* 107 Or 162, 178, 214 P 377 (1923); *Laro Lumber Company v. Patrick,* 52 Or App 1035, 1040-1041, 630 P2d

---

[6] *Rushlight* and *State Construction* state that rescission is itself available only if the acceptor had not changed its position or suffered any damage *up to the time it became aware of the bidder's mistake.* But those cases do not foreclose a remedy that might be damaging to the acceptor (with the award below, Ace's total compensation would exceed all but the highest of the original bids), if the damage accrues *after* the acceptor becomes aware of the bidder's mistake and is caused in large part by the acceptor's own failure to respond forthrightly to the known error.

[7] Any other conclusion would place one such as Ace in the anomalous position that it is not enough that it is right, *i.e.,* that it is not bound to perform the disputed work at the bid price — it must correctly select, at the time it discovers the misunderstanding, precisely which legal theory supports its position. That is, in April, when Ace first protested, all parties understood that there was a reasonable question whether the reinforced duct banks were within the scope of the contract. But had Ace refused to work, which PGE now says was the appropriate response, even though Ace might subsequently prevail on its interpretation of the contract (which would necessarily foreclose its mistake theory), it would presumably be liable to PGE for breach of the provision which required it to proceed at Swan Wooster's order and resolve the dispute under prescribed procedure. However, had Ace proceeded to work, and prevailed on its mistake theory, it would recover nothing because it failed to rescind.

400 (1981). Moreover, we do not agree that there was a good faith dispute under these circumstances.

Affirmed.