**SDS LUMBER COMPANY, a Washington corporation, Plaintiff,**

v.

**ALLENDALE MUTUAL INSURANCE COMPANY, a Rhode Island corporation, Defendant.**

**Civ. No. 81–485BU.**

United States District Court, D. Oregon.

May 6, 1983.

Michael E. Haglund, David H. Lohman, Lindsay, Hart, Neil & Weigler, Portland, Or., for plaintiff.

Douglas G. Houser, John W. Buehler, Bullivant, Wright, Leedy, Johnson, Pendergrass & Hoffman, Portland, Or., for defendant.

JAMES M. BURNS, Chief Judge:

SDS Lumber Company (SDS) obtained a $427,610[1] jury verdict against Allendale

---

1. This is a net figure. The jury verdict and the figures quoted from SDS's proof of loss statements reflect the application of the insurance policy's $25,000 deductible clause.

Mutual Insurance Company (Allendale) on a business interruption insurance policy. The matter is now before me on SDS's motion for prejudgment interest. For reasons discussed below, the motion is denied.

## FACTS

This is a diversity action. Oregon law applies.

SDS is a Washington corporation. It operates wood products facilities in the Pacific Northwest, including the Cascade Locks Lumber Company (Cascade Locks) at Cascade Locks, Oregon. Allendale is a Rhode Island corporation. It insured SDS and its affiliates against business interruption losses.[2]

When the trial began on January 10, 1983, precisely three years had passed since a silver thaw hit western Oregon and Washington, causing severe property damage. In the Columbia River Gorge, ice and snow drifting to heights of over six feet collapsed many of the buildings at Cascade Locks.

At the time of the ice storm, Cascade Locks was shut down, in part, to allow SDS to modify the edger table in the sawmill. The mill had been closed since late fall 1979. However, SDS claimed that but for the ice storm it would have completed the modification and restarted the mill by mid-February 1980. In fact, SDS took advantage of the down time to modernize some of the facilities and did not restart the mill until well into the summer of 1980.

On August 13, 1980, SDS filed its initial proof of loss statement with Allendale, claiming it lost $274,819 on the production of ties, timbers, and chips for the period from February 18 through April 30. This was the period SDS estimated it would have

needed, using due diligence and dispatch, to repair the mill to where it could resume normal operations. Later, on March 6, 1981, SDS submitted a second proof of loss statement extending the claim period to May 30. This resulted in a claim of $448,011. Allendale rejected the claim and this lawsuit followed.

Following several months of discovery, SDS tendered a new statement of loss on February 23, 1982, based on its expectation that Cascade Locks would have produced dimension lumber in addition to ties, timbers, and chips. This statement, totalling $618,900, also revised upward the amount of wood products Cascade Locks would have produced and the expenses it would have incurred during the interruption period. At trial, SDS submitted into evidence a fourth computation of its claim. This resulted in the same net amount of claim as the third claim with different figures on anticipated gross profit and expenses. This fourth claim went to the jury.

At trial, the parties presented conflicting evidence as to when SDS would have restarted Cascade Locks had there been no ice storm. The 1980s have been exceptionally bad years for the wood products industry. Many mills have been idle. Consequently, the jury heard testimony from industry experts as to whether Cascade Locks could have weathered the economic climes better than it did the meteorologic.

The jury heard conflicting evidence as to the type, grade, and quantity of products Cascade Locks could and would have produced and at what prices. There was conflicting evidence as to whether SDS could have made up the production it lost at Cascade Locks by running an extra shift at one of its other mills. There was also con-

---

**2.** The insurance contract between the parties defines business interruption loss as follows:

[T]he actual loss sustained by the Insured due to necessary interruption of business as a result of physical damage caused directly by the perils insured against .... In the event the insured is wholly or partially prevented from producing goods or from continuing business operations or services and is unable: (a) to make up lost production within a reasonable period of time (not to be limited to

the period during which production is interrupted); or
(b) to continue business operations or services;
all through the use of any property or service owned or controlled or obtainable from other sources or through working extra time or overtime at the location(s) specified herein, or at such other location(s) acquired for the purpose.

flicting evidence concerning the reasonableness of the manner of performance of the repairs at Cascade Locks. SDS elected to repair the facility itself rather than employ the casualty repair expert whose services Allendale had promptly made available to SDS.

In sum, the jurors listened to four days' testimony from lumbermen, accountants, and contractors, and then, like Alexander with the Gordian Knot, returned a verdict for $427,610.[3]

## LAW

■ By statute, Oregon courts award prejudgment interest at nine percent per year on "[a]ll monies after they become due; . . ." Or.Rev.Stat. § 82.010(2)(a)

(1981). The Oregon courts interpret this grant as limited to breach of contract claims where the exact amount of the damages is either ascertained or readily ascertainable and the time from which the interest runs is easily ascertained. *Krieg v. Union Pacific Land Resources Corp.,* 269 Or. 221, 234, 525 P.2d 48, 54 (1974); *Public Market Co. of Portland v. City of Portland,* 171 Or. 522, 625, 130 P.2d 624, 138 P.2d 916, 918 (1943).

■ Because the Oregon courts do not allow prejudgment interest in personal injury actions, *Calcagno v. Holcomb,* 181 Or. 603, 613–14, 185. P.2d 251, 255 (1947), the award is apparently intended to compel debtors to pay debts when due rather than

---

**3.** To facilitate the jury's deliberations, I reduced the parties' instructions to a compendium. Even using this distilled instruction as a guide, I cannot figure out how the jurors arrived at the precise figure they did. The verdict does not equal any of the claims SDS submitted. But the jurors never asked me to clarify the instructions and it took them a relatively short five hours to reach their verdict. Apparently, with the electronic calculator they requested, the jurors devised a formula that made sense out of the variety of components of SDS's claims.

"The plaintiff, SDS Lumber Co., seeks to recover its net profits and fixed expenses for the period the January 10, 1980 ice storm interrupted its operations at Cascade Locks Lumber Co. The defendant, Allendale Mutual Insurance Co., insured SDS Lumber Co. and its affiliated company, Cascade Locks Lumber Co., against business interruption loss during 1980. Business interruption insurance puts the injured party in the position it would have been in had the injury not occurred. Your job is to determine what Cascade Lock Lumber Co.'s profits and fixed charges, if any, would have been if there had been no ice storm.

The insurance policy defines net profit and fixed expenses as follows:
1. Net profit is the profit Cascade Locks Lumber Co. was prevented from earning during the interruption period.
2. Fixed expenses include administrative expenses, interest on fixed indebtedness, advertising, taxes, other than income taxes, insurance, utility expenses, salaries or wages of personnel whose services had to be continued during the interruption or who are employed under guaranteed contracts, and all other items contributing to the overhead expenses Cascade Locks Lumber Co. incurred even though SDS did not operate the mill.

If you find Cascade Locks Lumber Co. would have lost money rather than earn a profit if it had operated during the interruption period, you should subtract that deficit from the fixed expenses SDS would otherwise be entitled to recover.

To find SDS suffered a business interruption loss, you must find the ice storm prevented Cascade Locks Lumber Co. from producing wood products. If you find the ice storm prevented Cascade Locks Lumber Co. from operating, you must then determine the period of time the storm closed the mill. The mill was idle when the storm damaged the mill. Therefore, you must determine (1) when SDS planned to open the mill and (2) when SDS, with due diligence and dispatch, should have repaired the mill to where it could resume normal operations. Normal operations means operations the way they would have been had there been no ice storm. It does not include operations as achieved by a modernization of the mill facilities. To determine when SDS planned to open the mill, you may consider the operation of the mill before and after the ice storm, and the market conditions during that time.

The insurance policy required SDS to do what it reasonably could to make up the interrupted production at Cascade Locks Lumber Co. If you find SDS reasonably could have produced some wood products at Cascade Locks Lumber Co. during the interruption period or reasonably could have made up some of the interrupted production at one of its other plants, you should subtract that amount from the net profits and fixed expenses SDS would otherwise be entitled to recover for the interruption period."

to make whole the party the debtor injured. As the Oregon Supreme Court said in *United Farm Agency v. McFarland,* 243 Or. 124, 133, 411 P.2d 1017, 1022 (1966): "[Or.Rev. Stat. § 82.010(2)(a)] imposes a duty to pay interest only in those cases in which the law recognizes a duty to pay a certain sum at a certain time and such a payment has not been made." [4] The ready ascertainability requirement makes sense in this context. If the object of the rule were to compensate injured parties for the loss of money that should have been theirs from the time of their injuries then there is no need to require that damages be readily ascertainable. Physical injuries are not ascertainable in the same sense as are contract damages because physical injuries do not take on a pecuniary character until the jury by its verdict says they do.

■ Prejudgment interest provides a disincentive to debtors to delay settling their accounts. If, however, a debtor cannot rea-

sonably compute what he owes the creditor, the potential award loses its compulsive effect. A debtor cannot wrongfully withhold that which he cannot know he owes. *See Public Market Co.,* 171 Or. at 628, 138 P.2d at 919. Because the award serves to compel the debtor to act, it is from the debtor's viewpoint the court must direct its inquiry into the ready ascertainability of the creditor's claim.[5] Of course, the evidence presented at trial is usually the best indicator of the information with which the debtor had to work.

## DISCUSSION

■ With those thoughts in mind, I turn to the questions central to this motion: whether SDS's business interruption loss was readily ascertainable and, if so, whether the time from which the interest runs was easily ascertained. I do not reach the second question because the short answer to the first is no.[6]

4. House Bill 2363 currently before the Oregon legislature would purportedly make prejudgment interest available in all cases. *See Hearings on H.B. 2363 Before the Special Task Force on Prejudgment Interest of the House Comm. on Judiciary,* 1983 Sess., Tape H–83–JUD–133, Side A at 147 (statement of Charles Burt) (March 8, 1983).

5. Relying on *Adams v. Northwest Farm Bureau Insurance Co.,* 40 Or.App. 159, 165–67, 594 P.2d 1256, 1259–60 (1979), SDS contends ready ascertainability is irrelevant where the debtor denies liability. While *Adams* is not a model of clarity, I do not read the case as supporting that proposition. The ascertainability requirement was not irrelevant. The defendant insurance company simply did not dispute the Adams' computation of their damages: "the parties agree[d] on the facts of the incident and disagree[d] only on the import of the terms of the policy." *Id.* at 167, 594 P.2d at 1260. As such, *Adams* is viewed properly in the line of classic, *i.e.,* easy, prejudgment interest cases in which the amount of damages, if any, is not in dispute; only liability is at issue. *E.g., Gray v. Mitsui & Co. (U.S.A.), Inc.,* 434 F.Supp. 1071, 1079–80 (D.Or.1977); *School District No. 1, Multnomah County v. Mission Insurance Co.,* 58 Or.App. 692, 714–15, 650 P.2d 929, 943 (1982); *Ace Electric Co. v. Portland General Electric Co.,* 55 Or.App. 382, 388–89, 637 P.2d 1366, 1369–70 (1981); *Carlson v. Blumstein,* 54 Or.App. 380, 383–85, 635 P.2d 380, 383–84 (1981).

By the same token, despite language to the contrary in *Arden-Mayfair, Inc. v. Patterson,* 46 Or.App. 849, 857–58, 613 P.2d 1062, 1066–67 (1980), a claim is not unascertainable simply because the parties do not agree on the amount in dispute. For example, in *Delaney v. Georgia Pacific Corp.,* 42 Or.App. 439, 446–49, 601 P.2d 475, 480–81 (1979), the court awarded prejudgment interest though the parties disputed not only the amount of the claim but also the method of its computation—cruises of timberlands. *See Corder v. A & J Lumber Co.,* 223 Or. 443, 450–51, 354 P.2d 807, 810–11 (1960).

6. I would be inclined to rule against SDS on the second prong of the test. Assuming SDS's business interruption loss were readily ascertainable, it is not at all clear from what time that interest should run.

SDS wants interest from October 12, 1980, sixty days after its initial proof of loss statement. But this statement claimed only a $274,819 loss on a production mix SDS later said it would not have produced. I cannot penalize Allendale for withholding $427,610 when SDS only asked for $274,819. I reject SDS's suggestion that interest runs on $274,819 from October 12, 1980, and on the balance from May 5, 1981, sixty days after SDS's $448,011 proof of loss statement. SDS based neither claim on the mix or quantity it ultimately said Cascade Locks would have produced. At oral argument, SDS's counsel said he believed the jury based its verdict on the production mix stated in SDS's third proof of loss statement. SDS

The Oregon courts have not dealt with whether to award prejudgment interest on a business interruption loss. My job, therefore, is to rule as I believe the Oregon Supreme Court would if it were faced with these questions. *Commercial Union Insurance Co. v. Ford Motor Co.*, 640 F.2d 210, 212–13 (9th Cir.), *cert. denied*, 454 U.S. 858, 102 S.Ct. 310, 70 L.Ed.2d 154 (1981). This is not an easy task because the cases are not sufficiently consistent with one another for me to identify the most cogent principles or relevant factors to guide me on my way.[7] Nevertheless, I conclude the Oregon Supreme Court would find Allendale could not have readily ascertained SDS's business interruption loss. I arrive at this conclusion based on the following factors.

1. SDS's business interruption loss was hypothetical. The mill was not operating at the time of the casualty. This does not prevent SDS's recovery of damages but it

does make the amount of damages difficult to ascertain.

Cascade Locks did not have an immediate past production when the ice storm damaged the mill. Allendale, and later the jurors, had to determine when, given the soft market, SDS would have reopened Cascade Locks. This decision necessarily involved conjecture. Then they had to determine what and how much wood products Cascade Locks would have produced. There was little historical evidence on which to base this decision. To determine the amount of SDS's damage also required exploration of the permissible duration of the interruption period, *i.e.*, the reasonableness of SDS's repair efforts and of the modifications to the facilities in the course of those repairs.

In a sense, this case can be analogized to lost profits cases. The Oregon courts are

submitted the third proof of loss statement on February 23, 1982, and recalculated that claim at trial.

7. It is difficult to reconcile the results even within narrow classes of cases. For example, in *City of Portland ex rel. Donohue & Fleskes Corp. v. Hoffman Construction Co.*, 286 Or. 789, 805–06, 596 P.2d 1305, 1315 (1979), the plaintiff subcontractor recovered the reasonable value of the labor and materials it furnished. The court awarded prejudgment interest. On the other hand, in *Unitec Corp. v. Beatty Safway Scaffold Co. of Oregon*, 358 F.2d 470, 475 (9th Cir.1966), the court held that the value of services cannot be ascertained by computation or reference to well-known standards of value.

In *Laro Lumber Co. v. Patrick*, 52 Or.App. 1035, 1040–41, 630 P.2d 400, 403–04 (1979), a builder received prejudgment interest on an award that equaled the contract price less the reasonable cost to cure defects. However, in *Cloud v. Riddell*, 54 Or.App. 917, 923, 636 P.2d 996, 999 (1981), a builder won a *quantum meruit* recovery less the cost of curing defects but no prejudgment interest.

In *Convoy Co. v. Sperry Rand Corp.*, 672 F.2d 781, 784–85 (9th Cir.1982), a purchaser's out-of-pocket expenses to cure defects in the seller's goods were readily ascertainable. But in *Soderhamn Machine Manufacturing Co. v. Martin Bros. Container & Timber Products Corp.*, 415 F.2d 1058, 1064 (9th Cir.1969), the same court found that a purchaser's out-of-pocket expenses to bring goods up to contract specifications were "not easy" to ascertain

though the purchaser supported each expenditure with an invoice.

*North Pacific Construction Co. v. Wallowa County*, 119 Or. 565, 572–73, 249 P. 1100, 1102–03 (1926) (per curiam), a contractor litigated the amount, type, and value of the excavating he had done. The court awarded prejudgment interest. However, in *State ex rel. State Land Board v. Corvallis Sand & Gravel Co.*, 18 Or.App. 524, 556–57, 526 P.2d 469, 484–85 (1974), *aff'd as modified*, 272 Or. 545, 536 P.2d 517, 538 P.2d 70 (1975), *vacated and remanded*, 429 U.S. 363, 97 S.Ct. 582, 50 L.Ed.2d 550 (1977), *remanded*, 283 Or. 147, 582 P.2d 1352 (1978), the State recovered the reasonable value of the use of its land but the court declined to add prejudgment interest to the award because the amount, location, and value of the gravel removed from the land had been the subject of "active litigation."

Given the difficulty reconciling these differing results in seemingly indistinguishable cases, one could be left with the impression that the courts were *sub silentio* reevaluating jury verdicts, thereby adopting the analysis of California Superior Court Judge A.A. Scott, who, in denying a motion for prejudgment interest on a business interruption claim, stated:

I am very frank to tell you that I think the plaintiff got a very, very substantial judgment in this case based on the facts as I heard them; and now, to come in and ask for interest on something that was as uncertain as this seems to be pouring [it] on a little.

*Esgro Central, Inc. v. General Insurance Co. of America*, 20 Cal.App.3d 1054, 1060, 98 Cal. Rptr. 153, 157 (1971).

particularly reluctant to award lost profits to a business without a proven track record. *See Western Energy, Inc. v. Georgia Pacific Corp.*, 55 Or.App. 138, 637 P.2d 223 (1981); *White v. Oregon Horticultural Supply, Inc.*, 40 Or.App. 323, 594 P.2d 1321 (1979). With a hypothetical starting point and with hypothetical production, SDS's business interruption loss was nearly as difficult to figure as the lost profits of a new business.

SDS contends its net profit was capable of being ascertained by reference to the 1980 wood products market. Allendale may well have been able to ascertain the market value of the wood products SDS would have produced at Cascade Locks. *See Corder v. A & J Lumber Co.*, 223 Or. 443, 450–51, 354 P.2d 807, 810–11 (1960). But Allendale could not have ascertained what and how much SDS would have produced by reference to the wood products market. This is not the kind of generally recognized standard of value to which *Public Market Co.* referred. *Cf.* Or.Rev.Stat. § 72.3050(1)(c) (1981). The wood products market is affected by myriad forces.

I do not mean to indicate a court should never award prejudgment interest on a business interruption loss. But this is not the easy case where Cascade Locks operated in a stable market and where the type, grade, and quantity of its production remained the same over time. The evidence did not show a lengthy history of production by Cascade Locks of a set quantity of a particular mix of wood products over a several month period interrupted only by the few months needed to repair the storm damage. In the easy case, Cascade Locks's past and future production would provide a ready guide for determining its losses during the interruption period. *See Stanley v. Onetta Boat Works, Inc.*, 303 F.Supp. 99, 106 (D.Or.1969), *aff'd*, 431 F.2d 241 (9th Cir.1970). Here, however, the equation contains as many, if not more, variables as it does constants.

2. SDS could not readily ascertain its own damages. Therefore, it is reasonable to conclude Allendale had the same difficulty.

During the course of this dispute, SDS submitted three proof of loss statements and four computations of its claim. SDS changed its mind about the types and amounts of wood products it would have produced at Cascade Locks. SDS also submitted different statements of the duration of the interruption period. None of these discrepancies prevent SDS from recovering its business losses but they serve to highlight the difficulty of reconstructing the company's past.

Submitting multiple claims does not automatically disqualify SDS from receiving prejudgment interest. *See Walter E. Heller Western, Inc. v. Bohemia, Inc.*, 61 Or. App. 57, 68, 655 P.2d 1073, 1079–80 (1982); *Isler v. Shuck*, 38 Or.App. 233, 239–40, 589 P.2d 1180, 1183–84 (1979). In *Heller Western*, the plaintiff demanded one figure then sued for and obtained a lesser sum. The court of appeals nevertheless awarded the plaintiff prejudgment interest. When it made its initial demand, the plaintiff did not have all of the information it needed to compute its losses. But the defendant did have the information and, in fact, ascertained the amount it owed the plaintiff. In *Isler*, the plaintiffs demanded one figure then sued for another. During trial, the plaintiffs reduced their prayer to a third figure and in rebuttal settled on a fourth, still lower, amount. But the computation of the plaintiffs' claim there depended on information of which only the defendant had knowledge. The defendant "doggedly resisted the plaintiffs' efforts to arrive at an agreed upon computation . . . ." *Id.* 38 Or.App. at 240, 589 P.2d at 1184. The plaintiffs' claim would have been ascertainable from the outset had it not been for the defendant's recalcitrance. By contrast, the information necessary to compute SDS's claim has been within its ken. Therefore, if SDS had trouble figuring out what and how much wood products it could and would have produced and when, I ought not penalize Allendale by concluding it wrongfully withheld that sum.

3. Much of the information necessary to extrapolate Cascade Locks's lost business

came from accountants and from industry and market analysts. If industry experts could reasonably differ over what Cascade Locks could and would have produced and at what cost one cannot sensibly describe as readily ascertainable the measure of damages arising from the interruption period proved here.

Of course, that one needs an accountant to compute a claim does not for that reason make the claim difficult to ascertain. *See McKean v. Bernard,* 54 Or.App. 540, 547–49, 635 P.2d 673, 677–78 (1981). But the level of expertise needed to compute the amount of the claim is a factor for a court to consider in determining ready ascertainability. This factor alone may not support a finding here that SDS's claim is not readily ascertainable. However, taken together with the hypothetical nature of the claim and SDS's own trouble determining its losses, the need for expert testimony is strong evidence of the claim's lack of ready ascertainability. If SDS's loss had not been hypothetical, it would not have had such a difficult time computing its claim. If the loss had been easy to figure, SDS would not have needed the expert analysts.

## CONCLUSION

To recover prejudgment interest, SDS must show Allendale could have readily ascertained SDS's business interruption loss. Allendale could not have done so. SDS's loss was hypothetical. It submitted a number of different statements of loss, and the evidence of the amount of the loss was complicated and diverse. SDS's motion for prejudgment interest is denied.[8]

8. The result in this case should not encourage insurance companies to stonewall business interruption claims. The prospect of an attorney's fee award alone may coerce insurance companies to pay meritorious claims. For instance, SDS's attorneys have petitioned for $90,000 in fees. Even if a fee award would not act as a Damoclean sword, prejudgment interest does not further a public policy so compelling that it requires Procrustean application.

Because the determination of a business interruption loss is an exercise in hypotheticals and necessarily requires the insurer and the

insured to work together, perhaps society's (and this court's) resources would be better utilized by resort to the policy's arbitration provisions. Parties should be encouraged to anticipate situations such as these in their insurance contracts. For example, parties could insert a clause allowing for prejudgment interest in all contested cases. Alternatively, they could agree to an award of prejudgment interest on any amount awarded above the figure tendered by the insurance company in settlement.